UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ROSEHOFF, LTD.,

        Plaintiff,

   v.

TRUSCOTT TERRACE HOLDINGS LLC,
TRUSCOTT TERRACE HOLDINGS GROUP
LLC, TRUSCOTT TERRACE
INTERNATIONAL HOLDINGS GROUP LLC,
GREGORY GANNON, and GORDON
GANNON,

        Defendants.

**DECISION AND ORDER**

14-CV-277S

## I.  INTRODUCTION

In this action, Plaintiff Rosehoff, Ltd., ("Rosehoff") seeks a declaratory judgment against Defendants, stating that Defendants do not have trade dress rights in a particular plastic bottle to hold a fuel-enhancement product, or a copyright on the particular label for that product. Before this Court is Rosehoff's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Docket No. 55), and its Motion for a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. (Docket No. 83). For the following reasons, Rosehoff's motion for summary judgment is granted, and its motion for a preliminary injunction is denied as moot.

## II.  BACKGROUND

Unless otherwise noted, the following facts are not disputed for purposes of the motion for summary judgment. This Court takes the facts in the light most favorable to Defendants, the non-moving parties.  See Mitchell v. City of New York, 841 F.3d 72, 75

(2d Cir. 2016) (at summary judgment, a court "views the evidentiary record in the light most favorable to ... the non-moving party").

Cataclean is a "chemical compound fuel-enhancement product that cleans automobile catalytic converters." (Plaintiff's Statement of Undisputed Facts, Docket No. 55-2, ¶ 5.) Rosehoff and its subsidiary, System Products UK, Ltd. ("SPUK"), own the rights to the Cataclean fuel-enhancement product, and Rosehoff holds the U.S. Trademark Registration for the Cataclean trademark. (Docket No. 55-2, ¶¶ 6-7; Docket No. 57-1, ¶ 6.)

In 2008, Russ Baigent, a principal of Rosehoff, along with defendants Gordon Gannon and Gregory Gannon, formed non-party Cataclean Americas LLC ("CAL") to distribute the Cataclean product in North America. (See Docket No. 55-2, ¶ 11; Docket No. 55-37 at ¶ 1; Docket No. 57-2 at ¶ 52.)

Also in 2008, SPUK entered into a licensing agreement with CAL ("the SPUK license"), allowing CAL to sell the Cataclean product in North America. (Docket No. 55-11 at pp. 2-17.)

From 2008 to either 2010 or 2011, CAL sold Cataclean in an aluminum bottle manufactured by the Exal corporation ("the Exal bottle"). (Docket No. 55-2, ¶ 5.) The Exal bottle had a long neck, cylindrical base, and "dual-step" design at the base of the neck. (Id., ¶ 23.) In July 2010, Gregory Gannon, in consultation with others affiliated with CAL, and apparently in response to concerns about delivery, denting, and leaking of the Exal bottle, began to seek a new supplier for the bottle. (Docket No. 55-22 at p. 2.) In a series of emails, he corresponded with a manufacturer in China to have a new bottle made.[1]

---

[1] The parties dispute whether the "history" emails provided by Defendants represent the complete

After back-and-forth emails regarding the bottle design, the Chinese manufacturer sent a bottle sample to Gregory Gannon. Gannon forwarded this sample to Hugh Collins, a principal of Rosehoff, in August 2010. (Docket No. 57-2 at ¶ 39.)

The parties dispute whether this bottle sample was an exact copy of the Exal bottle or a new design created by Gregory Gannon. Gannon asked the Chinese manufacturer to try to come "closer to the image of our existing bottle." (Docket No. 55-21 at p. 6) At the same time, Gannon asserts in his affidavit that he made a "critical design modification" to the Exal bottle and states that the bottle sample he ultimately received from China was different from the Exal bottle. (Gregory Gannon affidavit, Docket No. 57-2 at ¶¶ 32-37.) The parties agree that an affiliated UK company then began making plastic bottles using a mold made from the Chinese bottle sample. (Docket No. 57-2 at ¶ 43; Docket No. 55-37 at ¶¶ 17-18.)

On July 10, 2010, Gregory Gannon executed a "non-exclusive license agreement" with CAL ("the CAL license"), in which Gannon, as licensor, licensed the "proprietary bottle design" to CAL "for the purpose of packaging the Cataclean chemical product for distribution by [licensee]."[2] (Docket No. 55-24 at p. 2.) Gregory Gannon signed this agreement as licensor, and co-Defendant Gordon Gannon signed on behalf of the licensee, CAL. (Id. at p. 5.)

In February 2011, CAL faced a shortage of bottles. In response, CAL's partners in the UK, including Rosehoff, sent 2,500 bottles from their inventory for CAL's use. (Docket

---

correspondence between Gannon and his Chinese counterparts.

[2] Rosehoff disputes the authenticity of this license but assumes its validity for the purpose of its motion for summary judgment. (See Docket No. 55-1 at p. 13 n. 2.) In the emails Gannon provided from this period, Gannon does not appear to mention his development of a unique design, or of his licensing this design to CAL. (See Docket No. 55-21 at pp. 15-28.)

No. 55-2 at ¶ 35-36; Docket No. 55-23 at p. 2.) As noted earlier, whether this bottle design was based on Gannon's "original design" or was an exact copy of the Exal bottle is disputed.

In August 2011, SPUK informed CAL that it was terminating the SPUK license between the parties. (Docket No. 55-1 at p. 10.) The parties disagree whether this termination was valid, and whether the SPUK license is still in effect. Defendants contend that it was "irrevocable" until 2023, while Rosehoff argues that it was validly terminated in 2011. (See Docket No. 57-1 at ¶ 10; Docket No. 55-1 at p. 10.)

Defendants contend that CAL continued to operate and to sell the Cataclean product in the plastic bottle from April 2011 to April 2013. (Docket No. 55-2 at ¶ 50.) CAL sold approximately 300,000 units of Cataclean in the plastic bottle. (Id.) The record does not indicate what mold was used to make the bottles, who manufactured them, or the exact number of units sold. CAL ceased to function after a distribution agreement with Prestolite ended. (Docket No. 57-2 at ¶¶ 52-53.)  Rosehoff thereafter entered into new licensing agreements with other distributors—including Prestolite and Holley Products— to sell the Cataclean product. (Docket No. 83-2 at ¶¶ 12-13.)

In 2012, Defendants Gregory and Gordon Gannon formed defendant Truscott Terrace Holdings LLC ("TTH"), pursuant to Nevada law. (Docket No. 55-13 at p. 2.) On June 27, 2013, Gregory Gannon assigned his rights in the plastic bottle to TTH. (Docket No. 55-25 at p. 2.)

On January 2, 2014, TTH, through outside counsel, sent cease-and-desist letters to Rosehoff, and to many of Rosehoff's customers, licensees, and suppliers. (Complaint, Docket No. 1, ¶¶ 24-25.) These letters stated that TTH believed it had trade dress rights

4

in the plastic bottle for the Cataclean product, and that it would pursue "any and all legal remedies available for trademark infringement and dilution…and unfair competition." (Id., ¶ 24.) (see also Docket No. 55-19 at pp. 2 -16.) The letters demanded that Rosehoff and its licensees cease using the bottle, destroy all bottles in inventory, account for all sales using the bottle, and remove all bottle images from their promotional materials. (Id.)

On August 15, 2018, Gordon Gannon, as "the new Managing Member of CAL," sent a letter to Holley Performance Products, informing Holley that it was violating CAL's intellectual property rights by selling Cataclean, and that Holley—and its predecessor Prestolite—had been doing so since May 2013. (Docket No. 83-3 at p. 2.) The letter stated that "a company controlled by members of CAL also owns… the trademark in the United States to the standard 16 ounce bottle in which Cataclean is sold." (Id.) The letter further stated that CAL took its intellectual property rights seriously, but was "willing to discuss a resolution," including a renewal of the distribution arrangement, "in lieu of seeking injunctive relief, monetary damages, punitive treble damages, and attorney's fees." (Id. at p. 3.)

The parties have engaged in litigation on many fronts.[3] Relevant to the trade dress in question here, TTH has attempted several times to register the plastic bottle with the United States Patent and Trademark Office ("PTO"). TTH filed United States Trademark Application No. 86159235 ("the '235 application") on January 7, 2014, seeking entry on the Principal Register. (Docket No. 55-2 at p. 8; Docket No. 55-26 at pp. 2-8) The PTO refused to register the plastic bottle because it was a nondistinctive product that could

---

[3] These include a case in New York state court regarding the termination of the SPUK license, a case dismissed in this district regarding the arbitration clause in the SPUK license, and a challenge before the Trademark Trial and Appeal Board. (See Docket No. 57-1, ¶ 10.)

only be registered with proof of acquired distinctiveness. (Docket No. 55-27 at p. 3.)

On March 10, 2015, TTH filed U.S. Trademark Application No. 86559730 ("the '730 application.") for the same bottle design. On June 26, 2015, the PTO refused to register the bottle, for the same reasons as it rejected the '235 application. (Docket No. 55-2 at p. 9.) TTH amended the '730 application, and on February 5, 2016, the PTO issued a finding that the mark included functional elements that could not be protected as trademark under any circumstances. (Docket No. 55-31 at p. 3.) Specifically, the PTO found that the long neck was functional because it was "ideal" for dispensing fluids directly into fuel tanks. (Id.)

TTH then sought registration on the Supplemental Register. The '730 application was registered on the Supplemental Register on May 17, 2016. ("the '739 registration.") (Docket No. 83-5 at p. 2.) On the same day, Rosehoff filed a petition before the Trademark Trial and Appeals Board ("TTAB") for cancellation of the '739 registration on grounds of non-use, genericness, and fraud. (Docket No. 83-6 at p. 2.) TTH moved to suspend the cancellation proceedings, and Rosehoff consented. (Docket No. 83-7 at p. 3.) The TTAB cancellation action is stayed pending this Court's decision on the matter before it. (Id.)


### III.  DISCUSSION

Rosehoff seeks summary judgment on its request for a declaratory judgment that Defendants do not have trade dress rights in the plastic bottle or a copyright on the label. It argues that the bottle trade dress is not protectable because it is functional and has not acquired secondary meaning. Rosehoff also seeks a preliminary injunction barring Defendants from sending cease-and-desist letters based on their alleged rights in the

plastic bottle to Rosehoff or its licensees, suppliers, customers, or business associates.

Defendants oppose Rosehoff's motions, arguing that there are genuine issues of material fact that preclude a determination of their trade dress rights at this stage, and that Rosehoff has not shown the likelihood of success on the merits necessary for the issuance of a preliminary injunction.

## A.    Dismissal of Moot Claims

Rosehoff's complaint brings ten causes of action against Defendants. Rosehoff seeks declaratory judgment that Defendants' Trade Dress application No. 86159235 is invalid (First Cause of Action); that the Defendants' alleged trade dress rights in the plastic bottle are unenforceable (Second Cause of Action); that Defendants' alleged trade dress rights in "the Label" for the plastic bottle are unenforceable (Third Cause of Action); that Defendants' alleged trade dress rights in "the Chassis Label" are not enforceable (Fourth Cause of Action); that Defendants' Copyright Registration No. VA 1-887-971 for "the Label" is invalid (Fifth Cause of Action); that Defendants' alleged rights in "the Label" are not protectable by copyright (Sixth Cause of Action); that Defendants' alleged rights in "the Chassis Label" are not protectable by copyright (Seventh Cause of Action); that Defendants' United Kingdom Design Registration No. 4033752 is invalid (Eighth Cause of Action); that Defendants' alleged United Kingdom design rights are unenforceable (Ninth Cause of Action); and that Defendants do not have any rights in their pending United States Patent Application No. 13/537,253 (Tenth Cause of Action).

Rosehoff argues that the only two remaining claims are the second and fifth—the question of Defendants' trade dress rights in the plastic bottle and Defendants' copyright rights in "the Label," also referred to as "the private label." (Docket No. 55-1 at p. 9.)

Defendants state that all causes of action besides the trade dress rights in the bottle (Second Cause of Action) are moot because they no longer claim rights in the trademark applications or copyright or trade dress rights in the labels, and because the parties have agreed not to pursue UK claims in this action. (Docket No. 57 at p. 2.) Consequently, this Court will dismiss Plaintiff's First, Third, Fourth, Sixth, Seventh, Eighth, Ninth, and Tenth Causes of Action as moot. The Second and Fifth Causes of Action are resolved on the merits below.

## B.    Declaratory Judgment

Under the Declaratory Judgment Act, a district court has jurisdiction to hear an action for declaratory relief only when a case presents an "actual controversy." 28 U.S.C. § 2201(a). "The question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Islam v. Davis, No. 117CV776MADDJS, 2018 WL 8731540, at *1– 2 (N.D.N.Y. May 21, 2018) (quoting MedImmune, Inc. v. Genetech, Inc., 549 U.S. 118, 127, 127 S. Ct. 764, 771, 166 L. Ed. 2d 604 (2007)).

The Supreme Court requires that the dispute be

definite and concrete, touching the legal relations of the parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

MedImmune, 549 U.S. at 127 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S. Ct. 461, 81 L. Ed. 617 (1937)).

District courts have substantial discretion in deciding whether to declare the rights

of litigants. <u>Classic Liquor Imps., Ltd. v. Spirits Int'l B.V.</u>, 151 F. Supp. 3d 451, 454–55 (S.D.N.Y. 2015) (citing <u>Peconic Baykeeper, Inc. v. Suffolk Cty.</u>, 600 F.3d 180, 187 (2d Cir. 2010)). The Second Circuit has held that a "declaratory judgment action should be entertained when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." <u>Fort Howard Paper Co. v. William D. Witter, Inc.</u>, 787 F.2d 784, 790 (2d Cir.1986).

Declaratory judgment actions can be "particularly useful in resolving trademark disputes, in order to promptly resolve controversies where the alleged owner of a trademark right threatens to sue for infringement," and, as such "the finding of an actual controversy should be determined with some liberality" in such a case. <u>Starter Corp. v. Converse, Inc.</u>, 84 F.3d 592, 596 (2d Cir.1996). A more restrictive view could require a party "to go to substantial expense in the manufacture, marketing, and sale of its [product], and subject itself to considerable liability for a violation of the Lanham Act before its right to even engage in this line of commerce could be adjudicated." <u>Classic Liquor</u>, 151 F. Supp. 3d at 455.

Courts apply a totality-of-the-circumstances test to determine whether there is a true controversy and make fact-based determinations regarding whether the controversy is sufficient. <u>Nike, Inc. v. Already, LLC</u>, 663 F.3d 89, 96 (2d Cir. 2011), <u>aff'd,</u> 568 U.S. 85, 133 S. Ct. 721, 184 L. Ed. 2d 553 (2013). A court may consider the threat of future litigation and the existence of an aggressive litigation strategy. <u>Id.</u> (citing <u>MedImmune</u>, 549 U.S. at 128) ("the threat of future litigation remains relevant in determining whether an actual controversy exists"); <u>Diamonds.net LLC v. Idex Online, Ltd.</u>, 590 F. Supp. 2d

593, 598 (S.D.N.Y. 2008) ("While a threat of suit is not necessary to declaratory judgment jurisdiction, an aggressive litigation strategy ... may signal the existence of an actual controversy.").

Courts also consider cease-and-desist letters and proceedings before the TTAB when determining whether a controversy exists. <u>See, e.g.</u>, <u>Surefoot LC v. Sure Foot Corp.</u>, 531 F.3d at 1247 (10th Cir. 2008) (finding a controversy in light of "five separate TTAB oppositions combined with an extensive history of interactions between the parties in which the declaratory defendants expressly and repeatedly suggested historical and existing infringing activity by the declaratory plaintiff"); <u>Blue Athletic, Inc. v. Nordstrom, Inc.</u>, No. 10 Civ. 036, 2010 WL 2836303, at *4 (D.N.H. July 19, 2010) ("[T]he combination of two demand letters and formal TTAB opposition on infringement grounds, all steeped in the language of trademark infringement, is sufficient to meet the <u>MedImmune</u> standard."); <u>Venugopal v. Sharadha Terry Prods, Ltd.</u>, No. 07 Civ. 00484C, 2009 WL 1468462, at *4 (W.D.N.Y. May 22, 2009) (finding jurisdiction where the defendant asserted in cease-and-desist letter to plaintiff that it believed use of the plaintiff's trademark would infringe on the defendant's use of its own trademark and subject plaintiff to liability for trademark infringement and unfair competition).

Rosehoff argues that Defendants' cease-and-desist letters create a justiciable controversy and demonstrate an adversity of interests. It further argues that the letters cause fear and confusion in its licensees and customers, by threatening litigation and by calling into question whether Rosehoff is even entitled to license its product. (Docket No. 55-1 at p. 18-19.) Rosehoff argues that this uncertainty harms its business relationships. (<u>Id.</u> at 19.)

Defendants argue that their 2014 letters did not cause injury, and, regardless, were sent by their former counsel. (Docket No. 86, ¶ 21.) They argue that the August 15, 2018 letter is not a cease-and-desist letter, but rather, a "notice of CAL's property rights," and an invitation to undertake negotiations." (Id., ¶ 24.)

Having fully examined the record, this Court finds that there is a sufficient controversy regarding the trade dress rights in the plastic bottle to exercise jurisdiction under the Declaratory Judgment Act. The parties' ongoing litigation in numerous fora on the question of trade dress rights demonstrates the adversity of interests between them. Defendants' cease-and-desist letters alleging an intent to "enforce trademark rights" unless the recipients enter new licensing agreements with them, when recipients already license both product and bottle from Rosehoff (or its affiliates), creates both a controversy regarding who possesses trade dress rights in the bottle and confusion among licensees. A declaratory judgment will "clarify[] and settl[e] the legal relations in issue, and ... will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Fort Howard Paper, 787 F.2d at 790. Accordingly, this Court finds proper jurisdiction under the Declaratory Judgment Act to resolve the question of trade dress rights in the plastic bottle.

As for Rosehoff's request for a declaratory judgment that Defendants have no copyright in the "private label," Defendants state clearly that they are not claiming any rights in that regard. (Defendants' Statement of Undisputed Facts, Docket No. 57-1 at ¶¶ 51-52.) Consequently, there is no legal adversity here, and no controversy warranting a declaratory judgment on the copyright issue. The Fifth Cause of Action will therefore be dismissed for want of jurisdiction under the Declaratory Judgment Act.

**C.    Summary Judgment**

Rosehoff has moved for summary judgment on the question of whether Defendants have trade dress rights in the plastic bottle. Defendants maintain that disputed issues of material fact preclude summary judgment.

**1.    Rule 56 (a)**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts, Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); it must "offer some hard evidence showing that its version of the events is not wholly fanciful," D'Amico v. City of N.Y., 132 F.3d 145, 49 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the nonmoving party. Anderson, 477 U.S. at 252.

In the end, the function of the court at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

### 2. Trade Dress Rights

Rosehoff argues that the bottle in which Defendants claim trade dress rights is not protectable because it is functional and non-distinctive, and because Defendants have not used it in commerce. Defendants maintain that they have used the bottle in commerce and that they are not required to prove acquired distinctiveness, that is, secondary meaning, at this stage.

### a. Legal Standards

The Lanham Act defines the term "trademark" as "any word, name, symbol, or device, or any combination thereof" used by any person "to identify and distinguish his or her goods… from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. This definition includes not only source-identifying words or marks, but "trade dress." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 117 (2d Cir. 2001. A product's trade dress encompasses the overall design and appearance that make the product identifiable to consumers. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,

13

269 F.3d 114, 118 (2d Cir. 2001). Trade dress as a category "originally included only the packaging, or 'dressing,'" of a product, but in recent years has been expanded by many Courts of Appeals to encompass the design of a product." Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 209, 120 S. Ct. 1339, 1342, 146 L. Ed. 2d 182 (2000). Trade dress is thus the "overall composition and design [of a product], including size, shape, color, texture, and graphics." Waddington N. Am. Bus. Trust v. EMI Plastics, Inc., 02-CV-3781, 2002 WL 2031372, at *2 (E.D.N.Y. Sept. 5, 2002) (quoting Coach Leatherware Co., Inc. v. AnnTaylor, Inc., 933 F. 2d 162, 167 (2d Cir. 1991)); see also Yurman Design, 262 F.3d at 114 (trade dress includes "the design or configuration of the product itself"); Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 999 (2d Cir. 1997) ("The concept of trade dress encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer.").

> It is well established that trade dress can be protected under federal law. The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods. In these respects protection for trade dress exists to promote competition.

TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 28, 121 S. Ct. 1255, 1259, 149 L. Ed. 2d 164 (2001)

To have a protectable trade dress right, a party must have used the trade dress in commerce, and must demonstrate that its trade dress is both distinctive as to the source of the product and non-functional. See Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 377 (2d Cir.1997); Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch

Co., 292 F.Supp.2d 535, 541 (S.D.N.Y. 2003); Yurman Design, 275 F.Supp.2d at 510; 15 U.S.C. § 1125(a).

Trade dress rights arise from the use of the trade dress in commerce. See Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 365, 370 (S.D.N.Y. 2007) ("In the absence of federal registration [of a mark], prior ownership of a mark is only established as of the first actual use of a mark in a genuine commercial transaction.") (quoting Allard Enterprises v. Advanced Programming Resources, 146 F.3d 350, 358 (6th Cir. 1998)). This is because "[t]he Lanham Act does not create the … right; it only recognizes the right acquired through use." La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1270 n.5 (2d Cir. 1974); see also Jaffe v. Simon & Schuster Inc., 3 U.S.P.Q 2d 1047, 1049 (S.D.N.Y. 1987) ("[T]he fact that the plaintiff was the first to file an application to register the mark does not bolster his case. Ownership of a mark is not determined by the race to the [PTO], but by the race to the market."). A "bona fide" commercial use must be followed by "activities proving a continuous effort or intent to use the mark." Chance v. Pac–Tel Teletrac, Inc., 242 F.3d 1151, 1156–57 (9th Cir.2001); see also Personal Publ'ns, Inc. v. Sagittarious Broad. Corp., No. 95 Civ. 4333(DLC), 1996 WL 734902, at *3 (S.D.N.Y. Dec. 24, 1996).

The use-in-commerce requirement can be met by a licensee using a mark on behalf of a licensor. Hawaii-Pac. Apparel Grp., Inc. v. Cleveland Browns Football Co. LLC, 418 F. Supp. 2d 501, 506 (S.D.N.Y. 2006) (citing 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 18.46 (4th ed. 2004) ("Ownership rights in a trademark ... can be acquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made ... by the licensee.")).

15

Further, "[t]o be entitled to protection under the [Lanham] Act, plaintiff's trade dress must either be inherently distinctive or be shown to have acquired distinctiveness through 'secondary meaning.'" Landscape Forms, 113 F.3d at 377 (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 774, 112 S. Ct. 2753, 2759-60, 120 L. Ed. 2d 615 (1992)). "In either case, it is the ability of the trade dress to designate a product source that is decisive." New Colt Holding Corp. v. RJG Holdings of Fla., Inc., 312 F.Supp.2d 195, 206 (D. Conn. 2004).

But for product design cases, the Supreme Court has stated that "a product's design is distinctive, and therefore protectible, *only* upon a showing of secondary meaning." Samara Bros., 529 U.S. at 216 (emphasis added). Therefore, because trade dress rights in the plastic bottle's product design are at issue, Defendants must establish secondary meaning. See id.; Maharishi Hardy, 292 F.Supp.2d at 541 ("In product design cases such as this one, however, the Supreme Court has held that the plaintiff must always make the more difficult showing of 'acquired distinctiveness.") (quoting Samara Bros., 529 U.S. at 216)).

Trade dress has "acquired distinctiveness" if it has developed secondary meaning. Samara Bros., 529 U.S. at 211. Secondary meaning occurs when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982) (citing Kellog Co. v. Nat'l Biscuit Co., 305 U.S. 111, 118, 59 S. Ct. 109, 115, 83 L. Ed. 73 (1938)); see also Samara Bros., 529 U.S. at 211 n. 1 (explaining that secondary meaning, which originated as a word mark concept, has "come to refer to the acquired, source-identifying meaning of a nonword

mark as well").  Defendants therefore must set forth evidence that "over time, the trade dress has become identified with its producer in the minds of potential consumers."  L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., 79 F.3d 258, 263 (2d Cir. 1996).

Whether trade dress has acquired secondary meaning is a question of fact. Waddington, 2002 WL 2031372, at *5.  The factors to be considered, none of which is dispositive, are as follows: "(1) advertising expenditures, (2) consumer studies linking the mark to source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1222 (2d Cir. 1987), overruled on other grounds as recognized by, Bristol-Myers Squibb Co. v. McNeill-P.P.C., Inc., 973 F.2d 1033, 1044 (2d Cir. 1992); see also Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 143 n. 4 (2d Cir. 1997); Fibermark, Inc. v. Brownville Specialty Paper Prods., Inc., No. 7:02-CV-0517, 2005 WL 1173562, at *5 (N.D.N.Y. May 11, 2005); New Colt Holding, 312 F.Supp.2d at 206 (noting that no single factor is determinative and every factor need not be proven).

Notwithstanding distinctiveness, no protection under the Lanham Act is available if the claimed trade dress is functional. Samara Bros., 529 U.S. at 216 ("It is true, of course, that the person seeking to exclude new entrants would have to establish the nonfunctionality of the design feature . . ."); see also Nora Beverages, 269 F.3d at 118 ("trade dress is protected under the Lanham Act if it is not functional and if it is either inherently distinctive or has acquired secondary meaning in the marketplace"); Fibermark, 2005 WL 1173562, at *3 ("Even if Plaintiff can demonstrate that its trade dress is entitled to protection, there can be no liability if the feature is functional."); 15 U.S.C. § 1125(a)(3).

This is because "[i]t is the province of patent law, not trademark law, to encourage invention by granting investors a monopoly over new product designs or functions for a limited time . . . after which competitors are free to use the invention." Qualitex, 514 U.S. at 164. Therefore, designs that are functional are not entitled to trade dress protection. See 15 U.S.C. § 1125(a)(3).

"A product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Yurman Design, 262 F.3d at 116 (quoting TrafFix, 532 U.S. at 32) (internal quotation marks omitted). In cases involving an aesthetic feature, the dress is also functional if the right to use it exclusively "would put competitors at a significant non-reputation-related disadvantage." TrafFix, 532 U.S. at 32. "Where an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doctrine denies such protection." Maharishi Hardy, 292 F. Supp. 2d at 542–43 (quoting Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., Inc., 916 F.2d 76, 81 (2d Cir.1990)). The purpose of the functionality doctrine "is to prevent advances in functional design from being monopolized by the owner of [the mark] ... in order to encourage competition and the broadest dissemination of useful design features." Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 224 (2d Cir. 2012) (internal emphasis omitted).

The Second Circuit Court of Appeals has warned district courts to exercise "particular caution" when extending protection to product designs. Landscape Forms, 113 F.3d at 380. This is because most product designs are not intended to identify the

source of the product, but rather, are intended to enhance the product by making it more useful or appealing. See Samara Bros., 529 U.S. at 213 ("In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist.") The danger is that "granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves," which would defeat the "strong federal policy in favor of vigorously competitive markets." Landscape Forms, 113 F.3d at 379, 380.

### b. Defendants have submitted no evidence from which a reasonable factfinder could conclude that the plastic bottle is entitled to trade dress protection

Rosehoff argues that Defendants do not have trade dress rights in the plastic bottle because (1) the bottle is generic, (2) Defendants have not used it in commerce, (3) it is functional, and (4) it does not have secondary meaning. Defendants argue that they have used the bottle in commerce, because CAL's use accrued to Gannon, the bottle's licensor, and because Gannon later assigned his rights in the bottle to TTH. Defendants do not argue that the bottle is nonfunctional, nor do they present any evidence of secondary meaning.

Images of the plastic bottle can be found at Attachment 1, which contains an image of the plastic bottle underneath an image of an aluminum bottle. These images were attached to the assignment of rights from Gregory Gannon to TTH. (Docket No. 55-25 at p. 5.) The present decision concerns only the plastic bottle depicted in Attachment 1.

This Court need not linger on each of the elements of trade dress because Defendants concede that they cannot establish secondary meaning for the plastic bottle, and they have offered no evidence on that element. (See Docket No. 57 at p. 8-9.) Without

a showing of secondary meaning, there can be no trade dress protection. <u>See</u> <u>Samara</u> <u>Bros.</u>, 529 U.S. at 216 (finding that a product design trade dress is protectable only upon a showing of secondary meaning).

In its statement of undisputed facts, Rosehoff states that "[n]either the Gannons nor Truscott have sold a single unit of any product bearing their own trademark, including the Plastic Bottle." (Docket No. 55-2 at ¶ 2.) Rosehoff also asserts that Defendants have not advertised the plastic bottle or obtained any media coverage or consumer surveys regarding it. (<u>Id.</u> at ¶ 18.)

In response, Defendants do not present any evidence suggesting that the bottle has acquired distinctiveness. Instead, they argue that TTH and the Gannons need not establish secondary meaning, because CAL's sales of the bottle establish TTH's rights.[4] But Defendants do not set forth any evidence that CAL established secondary meaning in the bottle, either. Trade dress is protectable only if the elements making up the trade dress at issue identify the source of the goods. <u>See</u> <u>Fabrication Enters. v. Hygenic Corp.</u>, 64 F.3d 53, 35 U.S.P.Q.2d 1753, 1756 (2d Cir. 1995). As discussed above, evidence of secondary meaning can be advertising expenditures, consumer studies linking the mark to source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and length and exclusivity of the mark's use. <u>Centaur Commc'ns</u>, 830 F.2d at 1222. Defendants do not offer any evidence that the design of the bottle has achieved secondary meaning, whether for TTH, Gregory or Gordon Gannon, or CAL.

Instead, Defendants argue that they are not required to come forth with evidence

---

[4] Because there are issues of fact regarding the validity of the license by which CAL's sales of the bottle accrued to Gregory Gannon's benefit, this Court will not address the issue here.

of secondary meaning because the design is on the Supplemental Register, and they should be afforded more time to establish secondary meaning. (Docket No. 57 at p. 9.) But this is inconsistent with Defendants' acknowledgement in their papers that secondary meaning is presently at issue. ("the Plastic Bottle has acquired secondary meaning and distinctiveness"). (See Docket No. 57-1 at p. 5.) And their argument that they should be given time to establish secondary meaning is an admission that there is no secondary meaning at this time.

Further, the plastic bottle's registration on the Supplemental Register does not suffice to defeat Rosehoff's motion for summary judgment. "[E]ven descriptive terms can be registered on the Supplemental Register without proof of secondary meaning, as long as they are deemed capable of acquiring such meaning." Loctite Corp. v. Nat'l Starch & Chem. Corp., 516 F. Supp. 190, 203 (S.D.N.Y. 1981). The presence of a mark on the supplemental register, in fact, "indicates a preliminary determination that the mark is *not* distinctive of the applicant's goods." Fashion Week, Inc. v. Council of Fashion Designers of Am., Inc., No. 16-CV-5079 (JGK), 2016 WL 4367990, at *6 (S.D.N.Y. Aug. 12, 2016) (emphasis added) (citing 3 McCarthy on Trademarks § 19:36 (4th ed.)). See also E.T. Browne Drug Co. v. Cococare Prods, Inc., 538 F.3d 185, 87 U.S.P.Q.2d 1655 (3d Cir. 2008) (a plaintiff with only a Supplemental Registration has the burden to prove "the existence of a protectable mark."); In re Federated Dep't Stores, 3 U.S.P.Q.2d 1541 (T.T.A.B. 1987) ("It is overwhelmingly agreed that a Supplemental Register registration is evidence of nothing more than the fact that the registration issued on the date printed thereon. … It is entitled to no presumptions of validity, ownership or priority.").

Under ordinary circumstances, a party on the Supplemental Register may continue

establishing secondary meaning for its mark. <u>See</u> <u>Jewish Sephardic Yellow Pages, Ltd.</u> <u>v. DAG Media, Inc.</u>, 478 F. Supp. 2d 340, 347 (E.D.N.Y. 2007) ("While registration on the Supplemental Register is not evidence of ownership, validity, or the exclusive right to use, such registration enables the registrant, *inter alia,* to sue for infringement in federal court ... If, through continuous use in commerce, the mark acquires "secondary meaning"—that is, the mark comes to be uniquely associated with its source—it becomes eligible for registration on the Principal Register.") (citing 15 U.S.C. § 1052(f); Catherine Rowland, "2003 Trademark Law Decisions of the Federal Circuit," 53 <u>Am. U. L. Rev.</u> 909, 925 n. 137 (2004)).

But given the posture of this case, Rosehoff's motion for summary judgment requires Defendants to make at least some showing from which a reasonable trier of fact could conclude that the bottle has secondary meaning. Product design trade dress is, after all, not protectable without a showing of secondary meaning. <u>Samara Bros.</u>, 529 U.S. at 216. Absent evidence of secondary meaning, no jury could reasonably find for Defendants. <u>See</u> <u>Anderson</u>, 477 U.S. at 252. Rosehoff is therefore entitled to summary judgment on its declaratory judgment claim that Defendants have no trade dress rights in the plastic bottle at issue.

**D.  Preliminary Injunction**

Rosehoff has moved for a Preliminary Injunction enjoining Defendants from sending cease-and-desist letters to Rosehoff's licensees or business associates during the pendency of this litigation. Because this Court is granting Rosehoff's motion summary judgment and declaring that Defendants do not have trade dress rights in the plastic bottle, Rosehoff's motion for a preliminary injunction barring letters asserting those trade

dress rights is denied as moot.

## IV. CONCLUSION

For the reasons stated above, Rosehoff's Motion for Summary Judgment is granted. And because this decision resolves the issue underlying the cease-and-desist letters, Plaintiffs' Motion for a Preliminary Injunction will be denied as moot.

## V. ORDERS

IT HEREBY IS ORDERED, that Rosehoff's Motion for Summary Judgment as to its second cause of action (Docket No. 55) is GRANTED.

FURTHER, that this Court declares that Defendants do not have trade dress rights in the plastic bottle depicted in Attachment 1.

FURTHER, that Rosehoff's fifth cause of action is DISMISSED for lack of jurisdiction.

FURTHER, that Rosehoff's first, third, fourth, sixth, seventh, eighth, ninth and tenth causes of action are DISMISSED as MOOT.

FURTHER, that Rosehoff's Motion for a Preliminary Injunction (Docket No. 83) is DENIED AS MOOT.

FURTHER, that the Clerk of Court is directed to CLOSE this case.


SO ORDERED.

Dated:     March 27, 2020
           Buffalo, New York


                                        s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge

Attachment 1

